Thank you very much. Good morning. Mitch Tilner for the Defendant's Star and XL. As I said, I'd like to address the issues on my appeal first, since I believe the outcome could moot the other appeal. You guys have certainly cooked up a complicated case here. Thank you, Your Honor. And out of a straightforward refusal to pay on a policy. Well, the issue now is attorney's fees, the principal issue on our appeal. There are three categories of attorney's fees. Ears perk up all over the courtroom. There are three categories of fees that are at issue here. The first is the fees incurred to litigate this action. Now, that award was error. The contract at issue did not specifically provide for attorney's fees in an action on the contract. In fact, the parties did not even contemplate an action on the contract. The contract required arbitration of all disputes. They did not. Can you just explain something to me? Just on timing, your clients took over the movie in July of 2001, right? That's correct, Your Honor. Okay. The arbitration was proceeding at that time because the award was in December of 2001. I guess I don't know when the arbitration actually began and ended as I sit here. But the arbitration award was five months after that. Why wasn't this dispute arbitrated? There are a couple of good reasons for that. First of all, there was no contract between my clients and the plaintiffs. But your clients basically stepped into the shoes of the producers here, right, and took over the movie. Our clients took over production of the film. So why wouldn't they, if you're right, and I agree with you, this dispute should have been arbitrated. Why wasn't the whole dispute arbitrated? Well, the dispute between the contracting parties was arbitrated to a judgment. Now, our client took over production of the film. Our client had no contract with the plaintiffs. Our client did not suffer any arbitration award. Our client had no way to know that the producer would lose the arbitration and then fail to pay the judgment against it, which years later prompted the litigation in which we're now involved. Our clients had no relationship with the plaintiffs. We came in, took over the film, and tried to complete it. But the plaintiffs were paying the payroll of the people who were making the film, right? That occurred before we came on the scene, Your Honor. At the time those invoices were issued, our clients were not on the scene. Yeah, but you signed a contract that you were going to back up the producers. We did not sign a contract for the benefit of the plaintiffs, Your Honor. In this Court's previous mem dispo, the Court noted that the plaintiffs were not beneficiaries of the bond. The bond was issued for the benefit of the financier, not for the benefit of plaintiffs. There was no relationship between the defendants and the plaintiffs here. That's the problem. There was no contract, no relationship, yet the district court awards attorneys' fees. Plaintiffs incurred litigating against our client on the theory that our client stepped into the picture and assumed the contract. Well, let's look at the contract. There's no attorneys' fees provision. There's an indemnity provision, and we know that because it says we will defend the plaintiffs against claims and liabilities. Well, defense only makes sense in a third-party setting. Moreover, the sentence on which the district court relied, and that is quoted on page 22 of our red brief. Excuse me. That sentence provides for indemnity to officers, directors, subsidiaries, employees, agents of the plaintiffs. Well, there never was a contract between anybody and officers, directors, employees, agents. So the sentence cannot be contemplating attorneys' fees on the contract. The sentence is contemplating attorneys' fees incurred defending against third-party claims. That's an indemnity provision, not a fee-shifting provision. Moreover. So if there were such third-party claims, you would concede that your client would be responsible to pay them to the plaintiffs? If it fell within that provision, if it was a claim arising out of the performance of the contract, yes. A third-party action, that's what indemnity is all about. All right. And you would also pay their attorneys' fees incurred in connection with such a defense? Yes, Your Honor. The fees they incurred defending themselves against a third party would be covered by indemnity. So you are relying on the contract between the plaintiffs and the producers in order to reach that conclusion? Well, Your Honor, district court relied on the contract. We're explaining why that reliance was erroneous. The contract doesn't provide for fee-shifting in this case. No, but the obligation that you just agreed you would owe in connection with a third-party claim against the plaintiffs here comes from paragraph 12 of the contract. Yes, Your Honor. So if you're bound by paragraph 12, why aren't you also bound by paragraph 15, the arbitration? That's a good question. The district court also looked at paragraph 15. Let's have a good answer. Paragraph 15 does not apply here because it governs arbitration. It governs arbitration. It says the prevailing party shall be entitled to reimbursement of costs, including reasonable attorney's fees. Now, that sentence in isolation doesn't really mean much. The prevailing party, where, in what? When you look at that sentence in context of paragraph 15, it's clear. We're talking about an arbitration. Paragraph 15 talks about going to the American Arbitration Association. The prevailing party shall recover fees. The parties never contemplated court litigation. They required disputes. Says who? The contract, Your Honor. The contract says all disputes shall be arbitrated. And the prevailing party in the arbitration shall recover fees. This action, this dispute was handled. That would not include, if you have to go to court to enforce arbitration award, that would not include fees for getting, enforcing arbitration award? It might include fees incurred to enforce an award. That didn't happen here. There never was an award in this case. This has nothing to do with arbitration. This was a court action. There never was arbitration. I thought there was an arbitration. Not between our clients. No, not between your clients. But there was an arbitration in the underlying dispute between the producers and the plaintiffs. That is correct, Your Honor. And that brings me to the second category of fees that the district court awarded. And those were the fees the plaintiffs incurred to obtain that arbitration award against the producer back in 2001, or I believe it was. Now, the district court awarded to the plaintiffs against our clients the fees that plaintiffs incurred in that arbitration. And the court reasoned that our clients had assumed the contract and, therefore, must pay the fees the plaintiffs incurred. Now, the problem with that approach is that this court, in its earlier membispo, ruled essentially that because we had accepted the benefit of plaintiff services, we had to pay for that benefit. This court said... Seems sort of fair, huh? That's not unfair at all, Your Honor. We're not challenging that part of the... At least not anymore. Not anymore. That's right. Nor are we challenging the part of the judgment in this, on appeal here, that requires us to pay for those services. That's fine. We're challenging the fee award, representing the fees plaintiffs incurred going after the producer. And the reason is because this court said we have to pay for the benefit. This court said the measure of damages is star XL's benefit. And this court said because we acquired the film, we accepted the benefit of plaintiff's provision of payroll services. So, in other words, our obligation is to pay for the services that the producer never paid for. We're willing to do that. We did not assume all liabilities of the producer for his own breach of contract. That's an obligation imposed by law. That's not an obligation under the contract. This court said we have to perform the contract. We're willing to do that. But wasn't that the basis of the arbitration? That the producers defaulted and, therefore, they arbitrated that and they won an award that included attorney's fees and costs, correct? That was the producer's responsibility. We never assumed that responsibility. This court did not say we assumed that responsibility. But isn't that one of the benefits that this court previously found your client was responsible for? No, Your Honor. The benefit we received was payroll services from the plaintiffs. But they had to go to ‑‑ they had to enforce that, right, by going to arbitration, spending money going to arbitration, getting an award, and that ‑‑ and your client basically took over the movie and ends up with the movie as a result of all of the efforts that these plaintiffs went to. And they were ‑‑ and were forced to go to in order to enforce their contractual rights against the producers that you were indemnifying. Your Honor, their pursuit against the producer was of no benefit to us. What we benefited from was their provision of services on the film. And we're willing to pay for that at this point. Now. Yeah. Right. For the longest time you weren't. Your Honor, that was before I got into the case. But I'm talking about your client, not just you. Yes, Your Honor. Your client, I have to say, has not been terribly anxious to pay any money at any point in this case. Your Honor, here we are on the second appeal. As I said, we're willing to accept the responsibility for paying for the services, which is what this court said we owe. The district court, however, imposed a much greater obligation, and that's why we're here. Those district judges, you know. Can I hide behind these? You just never know what they'll do, you know. That's what we say about the appellate judges. All right. And sometimes it's hard to do justice. Your Honor, the third category of fees I'd like to briefly mention that the district court awarded were the fees the plaintiffs incurred attempting to collect the judgment against the producer. As we've explained in our brief, that cannot be right because the judgment against the producer extinguished the contract under which the district court purports to hold us responsible for those fees. The contract did not permit post-judgment attorney's fees. The law says when a judgment is entered on a contract dispute, it extinguishes the contract. So fees incurred thereafter were not the producer's responsibility, and he was the contracting party, so they can't be our responsibility. You've got about three minutes left. All right. I will reserve time for rebuttal, and I'm sure it will be on the pre-judgment interest issue, which is the subject of their appeal. Thank you. Okay. Thank you, Your Honors. Henry Bensby for the Plaintiffs' Appellants SCIE and PayPix, and we refer to them as entertainment partners. That's their trade name, and that's how we refer to them throughout the litigation. I'd like to answer one of the questions that it was Your Honor who raised. Why was this case not arbitrated in the initial arbitration? The timing, the chronology was in March 2001, my clients stopped providing services and essentially washed their hands of the problem. They commenced the litigation. The producer moved to compel arbitration. That motion was granted, and we commenced an arbitration. We didn't know that there had been a takeover of the film. We were involved in the film. That's not true of the parties that took over the film. The jury found that the broker, Worldwide Film Completion, was acting as Excel and Star's agent. They're the guarantors on the bond, and they fully knew that there was an arbitration. They could have, if they had wanted, tried to intervene in that arbitration. They chose not to. We didn't know that there had been a takeover, and so we didn't know that another party was now responsible. So during the arbitration, you did not learn the status of this project? I can't answer that because I didn't handle the arbitration. I am told that they didn't know, and there's not any evidence in the record. This was not brought out at all in this case. It's so unusual to have an arbitration about the underlying breach of contract taking a parallel path, in a sense, to litigation over the same breach of contract. Correct, and I have no doubt that if we'd known there had been a takeover, we would have sued them in the arbitration, but we didn't know. In my view, the most significant issue here is the prejudgment, prejudgment interest. Well, but isn't counsel right that if this is not an, well, there's prejudgment interest on the invoices, and I think that that's something that stands by itself, but you're not conceding that this is, you're still taking the position that the third clause in paragraph 12 is a strict indemnity rather than a fee shifting, are you? No, that clause is an attorney's fees provision under California law because it requires them to indemnify and hold us harmless from all losses resulting from or in any way connected with a breach of the agreement. And the Continental Heller case, the California appellate court case, is directly on point. It distinguished from other indemnity provisions, such as indemnifying a party from its performance on the contract with indemnifying for a breach. And it holds, explicitly holds, that in this, this contract, this provision is an attorney's fees provision, and in a litigation between the parties over breach of contract, the losing party has to pay fees. But this provision says that the producers will indemnify your clients against any suits arising out of the producer's breach of contract, and I'm obviously paraphrasing that. How would it be possible, if you were to sue the producers, your clients sue the producers, this, the way you read this is that the producers would have to defend your client in that very case between those same two parties. How is that possible? This provision really does multiple, multiple things. And if a third party had sued us, yes, they would have to defend us. No question about it. But they are obligated to hold us harmless from all losses, including attorney's fees. All costs and losses. It doesn't say suits. All costs and losses resulting from or in any way connected with the other party's breach of this agreement. But if you, but if that was what this was meant to say, why wouldn't it have said, in the event you sue us, we will pay your attorney's fees, or the prevailing party. Just like you did in paragraph 15. You knew how to do it in paragraph 15 in the arbitration clause. That's a clear fee shifting clause. Why wasn't that put here? Well, the next, I don't know. I really can't answer why it wasn't put here. But the next sentence in that provision makes it mutual because it runs exactly the other way. Well, it's sort of a rhetorical question. I don't think this was a factual inquiry. So why would one have differently phrased provisions unless they meant to have different effect? One could make the argument, as XL Star has in briefs, that the paragraph 15 only applies to an arbitration. This would then apply to a litigation. So it could well be that that's what the parties. Well, but if everything was supposed to be arbitrated, why would you have a second clause applying to litigation? Because a party, even subject to an arbitration agreement, can still sue in court. And if the other party does not move to compel, that waives the provision to arbitrate. So you can go to court. It's essentially a breach of contract if you have an arbitration provision. And you can go to court. And if the party doesn't object, you're in court, even if you have an arbitration provision. That wasn't the intent of this agreement. This agreement contemplated an arbitration should there be a dispute between your clients and the producers. I agree. So how could that clause possibly have been put there in the event that an arbitration was begun and nobody objected or no arbitration was begun and nobody asserted the right to arbitration? That doesn't make any sense. It may not make sense. But California law says this is an attorney's fees provision. And you can't continental hell or case it. It is, I believe, directly on point. If I may go to prejudgment interest. What the district court did is ---- You know, I see language like this all the time in all sorts of things. I mean, you go speak somewhere, they say, you know, for the privilege of speaking, now I want you to sign this waiver where you hold the harmless to the world. And you hold the world harmless. And that was ---- I always cross them out. But I have no idea what ---- anyway. I don't want to sign them, but I say when I'm signing them, I have not read this. And if I did read it, I wouldn't be able to understand it. My guess, Your Honor, is for a nicer judge that would work. I think my way is safer. Anyway. But, you know, obviously you're not responsible. And I think we're just expressing frustration today. Language that is what we call legalese, opaque. And people who draft these things seem to sort of put them in and then close their eyes and go to sleep. What I found in my experience is that the most heavily negotiated provisions are never the ones that you end up litigating on. Well, then probably there's a reason. The ones that are heavily negotiated really do wind up saying the things that the parties need to say. And everything else is thrown in. Boilerplate and nobody sings about it. Exactly. And I mean, I don't know for a fact, but I have to believe this was sort of my client's. Happens with jury instructions, too. I can't tell you how often I've gotten proposed jury instructions from parties. And I read them. I said, you took this from another case. These instructions come from a different case. And they say, oh, yeah. Sometimes that happens. But, you know, my point and what the district court found, and I think she was correct on this, is under California law, this is held to be an attorney's fees provision. And I don't think there's any way around the Continental Hatter case that explicitly says a provision like this is. And it contrasts it with other indemnification provisions. So it clearly goes to this very issue. So the wise district judge got that right. She got that right. The wise district judge got something else wrong. She got the prejudgment interest wrong. And what she did is she. . . Prejudgment interest is required. It's mandatory under California law when two conditions exist. When the amount of damages is certain or capable of being made certain by calculation. And where the plaintiffs are vested in the right to judgment on a particular day. What the district court did here is conclude. . . She found that the amount of the damages, the lost payroll, if you will, was certain or capable of being made certain. There were invoices submitted. There was no dispute on that point. There was a dispute on liability. No dispute at all on the amount of money. But she said because mitigation was always a potential until this Court's previous ruling, then it really wasn't certain. The net amount of the damages was uncertain. And that's wrong in our view for two reasons. First, this Court didn't say that mitigation. . . The fair reading of this Court's opinion is mitigation on this theory of liability should never have been in the case. We had other theories of liability where mitigation plainly was relevant. So it wasn't erroneous for the jury to consider mitigation in the abstract in this case. But on this theory, mitigation was never in the case. But more importantly, the way you deal with prejudgment interest and mitigation would make her conclusion irrelevant and erroneous. I can explain it by an example. I manufacture widgets. I sell to the defendant. I contract with the defendant to sell a million widgets for dollars. He says, fine. I tell my factory to make the widgets. And they make the widgets. And they pack them up. And they're right about to ship them. And the defendant calls me up and says, things have changed. I don't need your widgets anymore. Clear breach. Ignore all the anticipatory repudiation and all those issues. It's a breach. I have to mitigate my damages. I pick up the phone. I start calling around. The market for widgets has changed. And it takes me two months to find someone else who's going to buy my widgets and is only going to pay me $400,000 for them. Sell them the widgets. I get my $400,000. I then sue the defendant. I get a judgment at the end of the day. Technically, the judgment is for a million dollars. That's my loss. Less an offset of $400,000, which is what I've mitigated, plus prejudgment interest. What's the prejudgment interest that I get? For the two months from the defendant's breach until I get my $400,000, I get prejudgment interest on the full million dollars. Prejudgment interest is intended to compensate the plaintiff for the loss of the use of the money. So for that two-month period until I mitigated and got the money in from the new party, I get prejudgment interest on the full million dollars. Then for the remaining time period, from that two-month period until trial or judgment, whatever the ending point is, I get prejudgment interest on the $600,000, which is my net result. So even if the district court had been right that this court's earlier opinion somehow changed things, it's irrelevant. There was no evidence of mitigation. There's no evidence of any offset. We are entitled to prejudgment interest on the full amount from the date of the breach. And in this case, it's a big number because the date of the breach was roughly March 2001, and this court's opinion was June or July 2007. So we get – our view is we get prejudgment interest on that full-time period. Were the invoices payable when sent, or was there a period? The evidence, the undisputed evidence was on the date the invoices were sent, the amount was up. Now, this may be – And that goes to our vesting argument. Yeah, yeah. They make an argument about vesting. I understand. This may be too much of a nitpick. Now, I don't think they were in breach at the moment you sent the invoices. There must have been a period during which they had to pay, right? They were supposed – the contract requires them to pay on the day the invoices are delivered. And was there something in there that if they'd waited 30 days that you were going to charge them more? We have the right to charge interest. But prejudgment interest runs from the date of the breach. And if you're going to allow them 30 days in which to pay, they haven't breached until they haven't paid after 30 days. That may well be true, but our right to damages – Your right to interest runs from the date of the breach. Correct. Not from the date of billing. Well, but the date of billing in this case is the date of breach. Well, that can't be if, as a matter of ordinary business, you would have allowed them 30 days in which to pay. The evidence was, as a matter of ordinary business, we did not allow parties to pay. That may be cutting itself out. I'm more concerned, actually, with when we move from prejudgment to judgment. That is to say – because the interest rates are, as you know better than I do, prejudgment interest are unrealistically high, so you want lots of prejudgment. Postjudgment interest is quite low. I won't say unrealistically low, but low. So in your view, when does it move from – when's the judgment? What judgment are we talking about? Is it the judgment entered by the district court for the $2.8 million in change? Is that the point of judgment when it turns from prejudgment to postjudgment? I don't think so. I mean, there have been two previous judgments. There was a judgment the first time around where we got nothing. Plainly can't be that one. There's a judgment September 2008, which is what we're appealing from now. And there will be another – assuming the court agrees with us on any of these issues, there will be a new judgment somewhere down the road. The AT&T case, which we cite in our briefs – and I could give you the cite if you want, but it's in our briefs – it says the general rule is where a judgment is reversed, prejudgment interest runs through the date of the new judgment. There's an exception where the reversal effectively reinstates a previous legally sufficient determination of damages. And here, no one is appealing from – So just give me a date. I think you're leading up to telling me that the judgment is the September 2008 judgment. After that point, it is postjudgment interest. Is that what you're telling me? No. No, I believe we are entitled to prejudgment interest until the new judgment is out. Until the judgment that comes out of us? Yes. Well, it comes out of you. I knew that. It goes back to the district court. The district court enters a new judgment. Okay. I got the position. I disagree, but I got the position. Well, and if I may just speak to that briefly. The – no one is appealing from the $2.9 million part of the judgment. All the appeals are – I mean, our appeal is from the loss of the prejudgment interest that we think she should have awarded us. And so what you would be doing, if you agree with me, is not reinstating a previous legally sufficient determination of the prejudgment interest. We believe under the 18T case, it's not the exception. This would be the general rule. Well, in general rule, prejudgment interest keeps running until you get the real final judgment. Well, but there may be a couple of different judgments. One might be the judgment for the underlying liability on the payment. And the other might be the judgment, if you get it, as to attorneys' fees. And that might be post-judgment only after this is finished. I understand there may be different ways to slice and dice it. I mean, our position is we should be getting prejudgment interest all the way until the new judgment. And our support for that is the 18T case. Why does that not surprise me? Would that include the prejudgment interest on the attorney's fees, too? Yes. Yes, I think we're entitled to prejudgment. But you already have a judgment on the attorney's fees. That's correct. So wouldn't that – so since you have that judgment, wouldn't it be post-judgment? Isn't that what post-judgment means? You got a judgment. Now the interest rate that is applied to that award comes after the judgment you've already gotten. Assuming if we affirm that. That's correct. And it may well be that that's one way to slice it. I think the 18T case would suggest otherwise. But I can certainly see that point. But what I request, among other things, I certainly enjoy coming here, but it would really be helpful, I think, to the parties, and actually to the courts as well, is in connection with the question Your Honor just raised, to when does prejudgment interest run, to make it very clear so we don't have to come back here. Much as we like to see you, that might be a good idea. I'm more than happy to come here. I'd like to come here on another case. Particularly if you get prejudgment interest. Especially if I keep getting prejudgment interest. And if I may just respond to one thing in a brief. Not to mention the fees for coming here. This is on a contingency at this point, so I'm not sure that makes a difference at this point. You're here just for the pleasure. I actually grew up close to here, so I always like coming back to the Pasadena area. I remember when this building was an armory. They make the argument that we were not vested. The prejudgment interest statute requires both the amount to be certain and vesting. And their argument about vesting, in essence, is an argument on liability. That until liability is determined, there can't be vesting. And that can't be right, because no one would ever get prejudgment interest. And the case we cited in our letter submitted within the last month, that Evanston case, I think directly addresses that. Thank you. Isn't your opponent right that the invoices were capable of calculation at the time that they were rendered and payable? Assuming they were payable when rendered, I mean, that may be a small detail. But weren't they calculable at that point? Your Honor, the invoices were certainly in specific amounts. But counsel's arguing as though he's seeking prejudgment interest from the producer who owed the payments. When those invoices were issued, our clients were not on the scene. We had no debt. We had no obligation to pay those invoices. That was well before we took over the film. Yet they want interest going back to the date those invoices were issued. We had no obligation, owed no debt on those dates. Didn't you lose that argument in the prior appeal? No, Your Honor. On the prior appeal, the Court held that we assumed the contract. It did not hold that we had retroactive knowledge going back to the dates the invoices were issued that we would have to pay them or that we owed them. So you only assumed part of the contract. Well, Your Honor, the interest issue goes to when the defendant knew it owed the debt. When the defendant knew it owed the debt. At the time the invoice was issued, we did not owe them. We did not know we owed them because we didn't owe them. They weren't issued to us. We never saw them. We weren't on the scene. They were issued to a third party with which we had no relationship. So aside from the issue of whether we assumed the contractual obligations for prejudgment interest purposes, the question is go back to the date the invoices were issued. Who owed the debt on that date? It was not us. So prejudgment interest cannot go back to that date. But you owe the principal, right? So when you took this over, you owed what was ever outstanding at that moment. And that was the principal and the interest, at least until that date. And they still haven't been paid. Your Honor, when we took over the film, their right to recover from us had not vested. We did not know we owed them a debt at that point. We did not know that years later the jury would try the case. This Court would decide that we are now on the hook for that contract. Well, but they did. And whether you knew it or not, how is that relevant? Well, Your Honor, for prejudgment interest purposes, it goes to the defendant's knowledge. When did the defendant know he owed a debt in the sum certain? The jury awarded zero damages. And this Court reversed for a new trial on damages. So how could the defendant have known he owed a debt in the sum certain when this Court had just said you've got to have a trial on damages? Where does this requirement that you know come from? That's from the Chesapeake case, Your Honor, which is cited, I believe it's in our fourth brief. Chesapeake says you look at the purpose of the statute is to, twofold, to protect the interest by giving him the value of the use of the money, lost use of the money, and to protect the defendant, to ensure the defendant does not have to pay interest before the date on which it knows it owes the debt. Yeah, yeah. But you're confounding, or you're trying to split your knowledge from the producer's knowledge, and you're stepping into the shoes of the producers, in my view. We took over the film. We assumed the contract for purposes of performing the contract. That's true, Your Honor. Prejudgment interest is a separate issue. It's not under the contract. It's under the law. And finally, on the Continental Heller case, which is that indemnity issue, counsel says there's no way around it. Well, there is. I have two ways around it. It doesn't, the clause doesn't mention defense, and the clause doesn't mention employees, agents, subsidiaries, other affiliate entities. The Myers case discussed at length in our brief is closer to ours because it has those two features, and the court there said that's not a fee-shifting clause. That's an indemnity clause. Thank you very much. Okay, thank you. Case is argued. We'll stand for a minute.
judges: Gettleman, Kozinski, Fletcher W.